## CIRCUIT COURT OF MONROE COUNTY, INDIANA
301 North College Avenue, Room 201
Bloomington, IN 47404
(812) 349-2614

CAROLYN H. SRIVASTAVA,                                    CASE NO.

                        Plaintiff,

        -vs-                                    5800 5 1 212  PL 002625

DAVID F. HAMILTON, WILLIAM HAYNES,
MATTHEW KENNELLY, et al.,                                   DEC 28 2012

                        Defendants.                   CLERK MONROE CIRCUIT COURT

## SUMMONS

To Defendants' attorney:        United States Attorney for the Southern District of Indiana
((per FRCP  4(i)(1)(A))        c/o Civil Process Clerk
                                10 West Market Street, Suite 2100
                                Indianapolis, IN 46204


        You are hereby notified that the person named as plaintiff has sued you in the Court indicated above.
The nature of the suit against you and the relief sought are stated in the complaint that is being served
with this Summons.
        You must file with the Clerk of this Court and serve upon the plaintiff's attorney at the address
below a response to the complaint within twenty (20) days, commencing the day after you receive the
complaint and this summons, or a judgment by default may be rendered against you for the relief
demanded in the complaint.


Date   12/28/12                          _____
                                          CLERK MONROE CIRCUIT COURT
                                  Clerk, Monroe Circuit Court   (Seal)


Carolyn H. Srivastava, Plaintiff *Pro se*
3105 Lehigh Court
Indianapolis, IN 46268-1320
Telephone (317) 876-0421

PRAECIPE: The following manner of service is hereby designated:

        __X__  **By Clerk via Certified Mail** with return receipt to the address indicated on the Summons.

        _____  **By Secretary of State via Certified Mail** with return receipt to the address indicated on
the Summons.

        _____  **Other mail service** (describe):

STATE OF INDIANA   )  IN THE MONROE CIRCUIT COURT
          ) SS:
COUNTY OF MONROE  )  CASE NO.

CAROLYN H. SRIVASTAVA,    53C06 1212 PL 002625
          )
       Plaintiff, )
          )
  vs.        )
          )
DAVID F. HAMILTON, EVAN BAYH, BRENT )
DICKSON, MARK MASSA, DIVISION OF STATE )
COURT ADMINISTRATION, FRANCES HILL, E. )
MICHAEL HOFF, MATTHEW HEADLEY, PURDUE)
UNIVERSITY BOARD OF TRUSTEES, MITCHELL )
DANIELS, GREGORY BALLARD, RICK HITE, )
METROPOLITAN DEVELOPMENT COMMISSION,)
REX JOSEPH, VERNON BROWN, MONROE )
GRAY, JR., ANGELA MANSFIELD, BRIAN )
MAHERN, FRANK MASCARI, WILLIAM OLIVER, )
MARY MORIARTY ADAMS, STEVE TALLEY, )
VOP OSILI, JOSE EVANS, MARION CIRCUIT )
AND SUPERIOR COURTS, MARION COUNTY )
PROSECUTOR'S OFFICE, GERALD ZORE, LINDA )
MAJOR, LULA PATTON, INDIANA UNIVERSITY, )
HANNAH BUXBAUM, LAUREN ROBEL, GERALD )
BEPKO, DAVID VONNEGUT - GABOVITCH, ZEFF)
WEISS, ELLEN GABOVITCH, AARON- RUBEN- )
NELSON MORTUARY, JAMES PAYNE, SHARON )
MURPHY, JOHN BARTHOLOMEW, JANICE )
HANKINS, MARTIN PRICE, AMANDA KRENSON, )
DONALD HARRIS, MICHAEL CASTELLARIN, )
MICHAEL SONTAG, AFNI, INC., TRACY BROWN, )
WILLIAM HAYNES, and MATTHEW KENNELLY, )
          )
       Defendants. )

FILED

DEC 28 2012

CLERK MONROE CIRCUIT COURT

## **COMPLAINT AND JURY DEMAND**

  1. Plaintiff brings a complaint alleging a pattern of racketeering and egregious violations

of civil rights, including interference in and disruption of plaintiff's living environment and a

persistent pattern of disruption of court operations, and of defendants' demeaning, disparaging,

and humiliating plaintiff, which has injured and continues to injure plaintiff in her property and

business, and which has deprived her of her basic human rights guaranteed by the *Constitution of*

*the United States.* Pursuant to Rule 38 (B) of the *Indiana Rules of Trial Procedure*, plaintiff demands a jury trial.

## I. PARTIES

2.a. Plaintiff Carolyn H. Srivastava is an unemployed single Jewish female citizen of Pike Township, Marion County, Indiana,[1] where she has resided continuously from 1985 through the date of filing this complaint, the past 21 years of that time in the College Park residential subdivision. I (plaintiff) am one of several Jewish residents/homeowners in College Park. I generally use the name Carolyn H. Srivastava or Carolyn Srivastava in my day-to-day transactions, and to the best of my knowledge I am the only person in the United States with that name.

b. As required by Ind. Trial Rule 3.1, I, plaintiff Carolyn H. Srivastava, am filing concurrently an appearance on my own behalf. No one other than I is authorized to take any action on my behalf.

3. Defendant David F. Hamilton, a vicious bully and anti-Semite who holds an Indiana license to practice law, has held a position as a circuit judge of the U.S. Court of Appeals for the Seventh Circuit from November 23, 2009 up to the present, a position he obtained after providing false information to the United States Senate. He was a judge of the U.S. District Court for the Southern District of Indiana from October 1994 – November 24, 2009, holding the position of Chief Judge from January 1, 2008 – November 24, 2009. He was given the lifetime position of enormous power in 1994 despite receiving a well-deserved rating of "Not Qualified" from the respected ABA Federal Judiciary Committee. For more than fifteen years, David F. Hamilton, who has exhibited malignant animosity toward *pro se*, non-attorney litigants, has perpetrated a pattern of relentlessly stalking me, interfering in my life, spreading vicious libel and slander about me, terrorizing me, and trying to force me to convert to Christianity. He twists the law His

---

[1] All references to Marion, Hamilton, Boone, Monroe, Lake, Putnam, and Tippecanoe Counties in this

chambers remain in the Birch Bayh United States Courthouse in Indianapolis, enabling him to disrupt district court activities, to forge "orders" on behalf of district judges. David F. Hamilton pretends to be a "liberal Democrat" but he is really a right wing extremist Republican.

4. Defendant Evan Bayh, an anti-Semite who has affiliated with the Democratic Party to take advantage of the respect and esteem accorded his father, was governor of Indiana from 1989-1997 and U.S. senator from Indiana from 1999-2011. He currently resides in Washington, DC and works for a K Street law firm, but his principal residence of record is a condominium in Washington Township in Indianapolis. Evan Bayh has spread false malicious gossip about me, attributing to me severely anti-social behavior, even though I have never met him face-to-face and he does not know me at all, because I am Jewish.

5. Defendant Brent Dickson has been a justice on the Indiana Supreme Court since 1986 and was recently appointed Chief Justice. Pursuant to Article 7, Section 4 of the *Constitution of the State of Indiana*, the Indiana Supreme Court has original jurisdiction over

> "admission to the practice of law; discipline or disbarment of those admitted; the unauthorized practice of law; discipline, removal and retirement of justices and judges; supervision of the exercise of jurisdiction by the other courts of the State; and issuance of writs necessary or appropriate in aid of its jurisdiction."

The Court appoints an administrator/clerk of courts to handle its ministerial duties and those of the Indiana Court of Appeals. Brent Dickson has been the Court's liaison to the Indiana Supreme Court Disciplinary Commission, which reviews complaints of attorney misconduct, and the Board of Law Examiners. Pursuant to Ind. Professional Conduct Rule 8.5, prescribed under authority of Ind. Code § 33-24-1-2 (b), attorneys admitted to practice in Indiana are subject to the disciplinary authority of Indiana, regardless of where the attorney's conduct occurs. Additionally, a lawyer not admitted to practice in Indiana is subject to Indiana disciplinary authority if the lawyer provides or offers to provide any legal services in Indiana. The Indiana Supreme Court allows thieves, scammers, con artists, and those who are completely ignorant of the law to freely

3

practice law in Indiana, so long as they use their licenses to attack Jews. Brent Dickson is being sued in his personal and official capacities.

6. Defendant Mark Massa is currently a justice of the Indiana Supreme Court, a position he obtained through intimidation tactics. He previously held the position of Executive Director of the Indiana Criminal Justice Institute, where he suppressed evidence of serious and pervasive errors made by the Indiana State crime laboratory. During the period 1995 through 2002 he held the position of Chief Counsel for the Marion County Prosecutor's Office, where he tried to destroy my life with fabricated criminal prosecutions, misusing criminal statutes for ulterior purposes never intended by the Indiana General Assembly, because I am Jewish.

7. Defendant Division of State Court Administration is an administrative office of the Indiana Supreme Court whose mission is "to assist the Chief Justice and Indiana Supreme Court in their leadership role as the administrators and managers of Indiana's judicial system, its courts, officers and related offices and programs" pursuant to Ind. Code Chapter 33-24-6. One of the Division activities has been to create forms for use in trial and appellate court proceedings, but it has no authority to sign those forms on anyone's behalf. The Division also runs the Indiana Commission on Judicial Qualifications, which reviews and acts on complaints of judicial misconduct. The Division cares more about convenience than ensuring that justice is served.

8. Defendant Frances Hill is judge of Monroe Circuit Court Division VI, to which one of my cases, number 53C06-1107-PL-001285, was assigned. She has used that case to interfere in other cases to secretly issue rulings adverse to me, by impersonating other judges. I have never met her in person.

9. Defendant E. Michael Hoff is judge of Monroe Circuit Court Division I, to which three of my cases were assigned. E. Michael Hoff compliantly allows other judges and litigants to interfere in his cases, to take unlawful actions adverse to me. I (plaintiff Carolyn H. Srivastava)

4

have never met him in person.

10. Defendant Matthew Headley is the judge of the Putnam Circuit Court. He has apparently been appointed special judge to hear a case to which I am a party.

11. Defendant Purdue University Board of Trustees ("Purdue Trustees") manages Purdue University, the other major state university in Indiana, pursuant to Ind. Code Ch. 21-27-20. Pursuant to Ind. Code §§ 21-23-3-2, 21-23-3-3, and 21-23-3-4, enacted in 2007 during Mitchell Daniels' term as governor, seven of the ten trustees of Purdue University, one of whom is a student, are selected by the governor. Three of the ten are purportedly selected by members of the Purdue Alumni Association and must be graduates of Purdue University and members of the Purdue Alumni Association. Because the alumni association assesses membership dues, these three trustee positions must be purchased. Pursuant to the above-cited legislation, the governor officially appoints all ten Purdue trustees, thereby allowing Mitchell Daniels to use political muscle to ensure that all candidates for selection by the alumni association meet with his approval. No doubt, a major criterion for appointment was the potential trustee's agreement to hire Mitchell Daniels as president. Of the ten current Purdue Trustees, eight are men. Nine of the ten are Caucasian and one of the men is African-American. Four reside outside of Indiana.

12.a. Defendant Mitchell Daniels, an anti-Semite, has been the Governor of Indiana from January 1, 2005 up to the present, a position that he has used to hurt the citizens of Indiana. From 2001-2003 he was federal budget director, where he turned a $236 billion projected budget surplus into a $400 billion deficit through reckless spending and mismanagement, and he has also mishandled taxpayer funds as governor. He may personally have gotten away with insider trading in that, as a privileged member of the board of directors of IPALCO, he sold his IPALCO stock at precisely the right time to make a substantial profit, while ordinary workers lost their retirement savings. Mitchell Daniels has repeatedly demonstrated that he will sacrifice the well-

being of the citizens of Indiana in pursuit of his own self-interest. He appointed and retained the abusive James Payne in the position of Director of Child Services to promote anti-Semitism in Pike Township and appointed brutish bully Mark Massa to the Indiana Supreme Court to ensure the promotion of anti-Semitism in Indiana courts.

   b. In 2007 he signed legislation giving himself sole power to appoint the Trustees of Purdue University. In 2012, his political patronage appointees rewarded Mitchell Daniels by hiring him as Purdue's president, even though, as someone who is narcissistic, vindictive, bigoted, and obsessed with money rather than education and research, he is not qualified for the position.

   13. Defendant Gregory Ballard is the mayor of the City of Indianapolis. The Indianapolis Department of Metropolitan Development Division of Planning and Zoning, which is supposed to gather accurate information and generate accurate reports about land use petitions, is part of his administration. Gregory Ballard, who resides in Pike Township, is being sued in his personal capacity and his official capacity as mayor of Indianapolis.

   14. Defendant Rick Hite is the Chief of Police of the Indianapolis Metropolitan Police Department ("IMPD"), the major law enforcement agency for Indianapolis/Marion County. IMPD was formed in 2007 by a merger of the law enforcement division of the Marion County Sheriff's Department ("MCSD") with the Indianapolis Police Department. The College Park neighborhood is in the IMPD North District, which also includes all of the Marion County Jewish congregations, as well as Marion County parcel no. 6027008. IMPD North District has perpetrated a policy in which the only perpetrators of crimes may be African-Americans, Hispanics, or Jews, and the only victims of crimes may be lily white Christians. With the blessing of the IMPD North District and its predecessor law enforcement, I have, over a period of nearly ten years been the victim of hate crimes of property violence against me because I am Jewish.

   15. Defendant Metropolitan Development Commission is a nine-member body that

6

makes decisions on all rezoning petitions in Marion County and certifies the decisions to the In-dianapolis/Marion County City-County Council ("City-County Council"). The Metropolitan De-velopment Commission under current president Edmund Mahern promotes discrimination against Jews in its land use decisions. Its votes are secret so we the public do not know which members voted for or against a proposal unless a vote is unanimous.

16. Defendant Rex Joseph is the Hearing Examiner for the Metropolitan Development Commission. He makes the initial decision on rezoning petitions.

17. Defendant Vernon Brown is the City-County councillor for Council District 18. City-County Council is the legislative body for the consolidated government of Indianapolis and Mar-ion County, Indiana. The City-County Council has final administrative authority to approve or deny rezoning petitions for the City of Indianapolis.

18. Defendant Monroe Gray, Jr. is the City-County councillor for Council District 8.

19. Defendant Angela Mansfield is the City-County councillor for Council District 2. She has served on the Board of the Jewish Federation of Greater Indianapolis, Inc.

20. Defendant Brian Mahern, an anti-Semite and puppet of Lula Patton, is the City-County councillor for Council District 16.

21. Defendant Frank Mascari is the City-County councillor for Council District 20.

22. Defendant William Oliver, an anti-Semite and puppet of Lula Patton, is the City-County councillor for Council District 10.

23. Defendant Mary Moriarty Adams is the City-County councillor for Council District 17.

24. Defendant Steve Talley is the City-County councillor for Council District 11.

25. Defendant Vop Osili is the City-County councillor for Council District 15.

26. Defendant Jose Evans is the City-County councillor for Council District 1, the district

in which I reside.

27. Defendant Marion Circuit and Superior Courts ("Marion County courts") are courts of coextensive original jurisdiction empowered to hear civil, criminal, probate, small claims, and juvenile matters arising within Marion County, Indiana. They are local government entities funded mainly by county revenue. Marion County courts have perpetrated policies of flagrantly violating state law and the Indiana and U.S. constitutions in their conduct of both civil and criminal cases, and have promoted a *de facto* policy of anti-Semitism and general bullying.

28. Defendant Marion County Prosecutor's Office handles criminal prosecutions for Marion County, Indiana.

29. Defendant Gerald Zore was a judge of the Marion Superior Court Civil Division from 1974-mid-2010. He was associate presiding judge and supervisor of the Marion Superior Court jury pool from 2001 through 2004 and 2009-2010. Since approximately July 2010 he has held the position of judge of the Probate Division. He has abused his position to confuse courts with the same number designation, and to mix up electronic court records from different cases and even different jurisdictions, to unlawfully interfere in cases in other jurisdictions, to create records of alleged proceedings that never took place, and to compel selection of jurors favorable to his agenda of extortion, bullying, and anti-Semitism.

30. Defendant Linda Major has been a Marion County deputy prosecutor since at least 1998. She has exhibited bizarre and delusional behavior in that she has relentlessly stalked me (plaintiff), stolen my identity to commit crimes in my name, and instigated my associates to falsely accuse me of crimes.

31. Defendant Lula Patton is a vicious anti-Jewish bigot who has burrowed into the Marion County Democratic Party. She holds the position of Pike Township Trustee, a position she has admitted to obtaining by voter intimidation, and for which she pays herself an excessively

high salary out of taxpayer funds. Her statutory duties include supervising the Pike Township Fire Department and dispensing poor relief, which she exploits to further her own self-serving agenda. She has manifested an attitude that she personally owns Pike Township.

32. Defendant Indiana University ("IU"), one of the two largest state universities of the State of Indiana, has legal controlling authority over Indiana University-Purdue University Indianapolis ("IUPUI"), which includes the Indiana University Robert H. McKinney School of Law ("McKinney Law") and the main campus of the Indiana University School of Medicine ("IUSM"), where I was employed for several years. IU also includes the Indiana University Maurer School of Law ("Maurer Law") in Bloomington.

33. Defendant Hannah Buxbaum is the interim dean of Maurer Law and John E. Schiller Chair in Legal Ethics. She is being sued in her official capacity.

34. Defendant Lauren Robel is provost and executive vice president of IU Bloomington. In her position as provost, she supervises student recruitment.

35. Defendant Gerald Bepko, an anti-Semite, held the position of Chancellor of IUPUI and vice president of IU from 1986 through 2002, where his reputation was that he did not care about faculty unless they were related to a state legislator. He currently holds the title of Professor of Law at McKinney Law and "Chancellor Emeritus." His license to practice law has been in inactive/retired status since 1991. I have never met him, other than shaking hands in a faculty reception line in 1993. As chancellor, Gerald Bepko exploited me as a tool in pursuit of his own selfish interests, sexually harassing me and punishing me for others' misconduct because I am Jewish. Gerald Bepko has exploited the prestige of his university position to instigate problems in courts and other government agencies.

36. Defendant David Vonnegut-Gabovitch, an accountant, is currently the president of the Jewish Federation of Greater Indianapolis, Inc. (hereinafter, "Jewish Federation"). He has,

for many years, held leadership positions in the Jewish Federation, an umbrella organization that purports to provide social services for Indianapolis-area Jewish associations and individuals. The Jewish Federation currently owns undeveloped property immediately south of the College Park subdivision, but not in the subdivision itself. David Vonnegut-Gabovitch has also held a position on the board of directors of Congregation Beth-El Zedeck ("Beth-El"), a Jewish congregation in Indianapolis. He has shown himself to be dishonest, vindictive, self-centered, and unconcerned with anyone's needs and rights other than his own.

37. Defendant Zeff Weiss, a vicious bully, has appeared on behalf of the Jewish Federation in some of my prior litigation. Having been associated with the Jewish Federation for many years, he has held a position as a board member for the past several years and is currently chair of the legal council committee. I, plaintiff Carolyn H. Srivastava, have never met Zeff Weiss in person and I have never authorized him to take any action on my behalf.

38. Defendant Ellen Gabovitch, a close relative of David Vonnegut-Gabovitch has, since 1985, been an attorney with the Indianapolis Office of Corporation Counsel, which provides legal advice and representation to city and county officials and agencies. She has also held leadership positions in the Jewish Federation, the Jewish Community Center, and Beth-El.

39. Defendant Aaron-Ruben-Nelson Mortuary is an Indianapolis-area mortuary that is the mortuary generally chosen by Jews. Its president Jennifer Williams has held a position on the board of directors of Beth-El. My parents signed a contract in 1996, irrevocable under Indiana law, for prepaid funeral and burial. It was unlawfully changed in 2004.

40. Defendant James Payne, an anti-Semitic resident of College Park, held the position of Director of the Indiana Department of Child Services from January 2005 –September 2012, when he was forced to resign. Prior to then, he was Judge of the Marion Superior Court Juvenile Division for more than twenty years. James Payne has abused the positions of trust to exploit

10

children as tools of intimidation against their parents and other adults, viciously destroying families and hurting innocent, defenseless children. I have never had any interactions with either juvenile court or the Indiana Department of Child Services, nor have I ever authorized James Payne to act on my behalf for any reason. James Payne currently refers to himself as a judge, but he has no judicial authority. He has exhibited a profound lack of knowledge and understanding of even the most basic legal principles.

41. Defendant Sharon Murphy, a mean-spirited, alcohol-abusing, anti-Semite and insufferable snob, is a resident of College Park. She has manifested an attitude that College Park Club assets are her personal property. Sharon Murphy claims to be an attorney, but has exhibited extraordinarily poor knowledge of the law, often acting on incorrect "legal advice" from non-attorneys. Motivated by uncontrolled jealousy, she has spread false malicious gossip that I allegedly file "frivolous" lawsuits. Sharon Murphy is not a member of our homeowners' board of directors, but she uses intimidation to induce them to comply with her self-serving misuse of the law. Sharon Murphy has also, since 2007, held a position as government poll inspector of my precinct, a position she has used to attempt to intimidate me out of voting in primary and general elections because I am Jewish.

42. Defendant John Bartholomew has been a resident and homeowner in College Park since 2000. He has been a selected but not elected member of the College Park Club Board of Directors since February 2012. He holds the position of public information officer, i.e. **not** a member of the planning staff, in the Indianapolis Department of Metropolitan Development.

43. Defendant Janice Hankins, a College Park resident, was a member of the Board of Directors of College Park Club for several years. In 2003 she used her accounting degree to embezzle more than $10,000.00 from our association treasury and cover it up.

44. Defendant Martin Price is currently a member of the Board of Directors of College

Park Club, Inc. ("College Park Club"), my neighborhood homeowners' association. He has shown himself to be an anti-Semite and mindless puppet of Sharon Murphy.

45. Defendant Amanda Krenson is an attorney whom College Park Club, Inc., my home-owners' association, has retained to provide legal counsel. Thus far, she has done a terrible job.

46. Defendant Donald Harris was a Tennessee senior judge who was apparently appoint-ed to hear Davidson County, Tennessee Circuit Court case no. 10P-1127, to which I am an un-willing party. He unlawfully exercised jurisdiction over the case, and there was no basis for per-sonal jurisdiction over me as a citizen of Indiana with no relevant contacts with the State of Ten-nessee. As of at least June 2012 he was no longer a judge at all. Donald Harris resides in Wil-liamson County (twenty-first judicial district), so, pursuant to Tenn. Code Ann. §§ 17-1-102 and 16-2-506, he is not eligible to hold a position as a regular circuit judge of Davidson County (twentieth judicial district). Donald Harris was never admitted to practice law in Indiana.

47. Defendant Michael Castellarin is a Nashville, Tennessee attorney whom Donald Har-ris unlawfully appointed trustee of an unlawful trust that names me (plaintiff) as beneficiary. He received his law degree from a law school that is not accredited by the American Bar Association ("ABA"), and he is therefore not eligible to practice law in Indiana. I (plaintiff Carolyn H. Sri-vastava) have never authorized Michael Castellarin to represent me for any purpose.

48. Defendant Michael Sontag is a Nashville, Tennessee attorney who, in collaboration with other defendants, commenced frivolous lawsuits against my father and me in Davidson County, Tennessee [seventh circuit] probate court. As a purported specialist in probate-related matters, he is one of the unscrupulous attorneys that take advantage of the vulnerable elderly, and anyone else they can exploit. He collaborates with the Davidson County Circuit Court clerk to forge unlawful orders. He was never admitted to practice law in Indiana. I, Carolyn H. Sri-vastava, have never authorized Michael Sontag to take any action on my behalf.

49. Defendant Afni, Inc. is a debt collection business with a history of using abusive practices to try to collect imaginary debts from susceptible citizens.

50. Defendant Tracy Brown is the power-mad Tippecanoe County Sheriff. One of his duties is providing building security for the Tippecanoe County courthouse. He arbitrarily arrests *pro se* litigants for any reason or no reason at all, just because he can get away with it, and also purports to serve bogus process in counties other than Tippecanoe. He has no legal authority to file documents on others' behalf other than returns of service, or to draft legal documents for others, or to issue court rulings.

51. Defendant William Haynes is a U.S. District Judge of the Middle District of Tennessee in Nashville, who has manifested malignant animosity toward *pro se*, non-attorney plaintiffs. He is being sued in his personal capacity only.

52. Defendant Matthew Kennelly is a U.S. district judge of the Northern District of Illinois in Chicago, assigned to hear case no. 1:11-cv-2116, in which I am the plaintiff. He did not do so. He is a member of the court's executive committee, which manages the court's affairs, including promulgating court rules and policies. The executive committee has a years long history of discriminating against pro se, non-attorney litigants to deny us justice. Matthew Kennelly is being sued in his personal capacity and his official capacity as an executive committee member.

53. Judges' claims that they are immune from suit under a theory of "judicial immunity" violates the constitutional Article III provision that the judicial power of the United States shall extend to **all** cases arising under the Constitution and Laws of the United States. Suits against judges are not excluded. Moreover, "judicial immunity" was affirmatively rejected in the Federal Courts Improvement Act of 1996, Public Law 104-317, which amended 42 U.S.C. §§ 1983 and 1988. The removal statute 28 U.S.C. § 1442, and 28 U.S.C. § 463, specifically contemplate that federal judges may be sued, and Ind. Code Chapters 33-23-13 and 33-38-12 contemplate suits

13

against Indiana judges.

## II. ALLEGATIONS IN SUPPORT OF COMPLAINT

### A. Jurisdiction and venue

54. This complaint states claims arising under the Indiana constitution and statutes and torts recognized in Indiana. I also state claims arising under 42 U.S.C. §§ 1983 and 1985 (violations of civil rights), 18 U.S.C. § 1961 *et seq.* ("RICO"), 42 U.S.C. § 3604 (discrimination in housing), and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* Federal and state courts have concurrent subject-matter jurisdiction over civil claims arising under these and other federal statutes in which Congress did not affirmatively confer exclusive jurisdiction on a particular court. 42 U.S.C. § 3613; *Maine v. Thiboutot*, 448 U.S. 1, 10-11 (1980); *Tafflin v. Levitt*, 493 U.S. 455, 457-458, 458-459, 460-461, 466 (1990); *Mims v. Arrow Financial Services, LLC.*, 132 S.Ct. 740, 748, 749, 751 (2012).

55. Monroe County meets preferred venue requirements pursuant to Ind. Trial Rule 75 (A)(4) and (5), as some defendants have their offices in Monroe County and some claims relate to a government agency, Monroe Circuit Court, and government agencies are named as defendants. Marion County courts cannot hear this case because they are parties.

56. I apply Rule 4.4 (A) of the *Indiana Rules of Trial Procedure*, the long arm statute Ind. Code § 35-41-1-1, and 18 U.S.C. § 1965 (a) and (b) to out-of-state defendants as appropriate. In particular, they have participated in federal racketeering activity, along with longstanding commission of identity theft against me (plaintiff), of course without my consent, and have generally injured me in the State of Indiana. They are also joined pursuant to Ind. Trial Rules 19 and 20.

### B. General background

57. There is a considerable amount of vicious anti-Semitism in Indiana, to the point of animal brutality. It manifests itself in subtle and not-so-subtle ways. Some Jews take advantage

14

of the anti-Semitism to benefit themselves at other Jews' expense.

58. Defendants have organized and maintained a criminal power and money-grabbing enterprise to which I have referred as the "Syndicate." Using oral sex as barter, i.e. sexual harassment/promoting prostitution, the Syndicate maintains among its objectives disparagement of women, in order to discount women's accomplishments with the rejoinder, "She slept her way up the ladder." As is common with criminal gangs, the Syndicate uses a code, in this case, one in which common words are given sexual meanings, to conceal the true nature of its activities.

59. Syndicate members embrace dishonesty and incompetence and sneer at integrity and real accomplishment. In furtherance of this agenda, the Syndicate recruits into its ranks individuals of poor moral character and with an over-inflated opinion of their own importance, who eagerly participate in unlawful activities to obtain benefits to which they are not entitled based on real merit. Syndicate judges, prosecutors, and police promise private citizens immunity from criminal prosecution in exchange for their cooperation.

60. Other typical Syndicate practices include rampant substance abuse, childishly accusing people of being mentally ill, rampant identity theft, malicious backstabbing, instigating conflicts within families, outright lying, requiring effusive, undeserved praise while claiming entitlement to retaliate against others for any real or perceived slight, taunting vulnerable targets with vague accusations, and surrounding their nefarious activities with a thick wall of secrecy.

61. Syndicate members attitude has been that they may do whatever they want to whomever they want, and no one is allowed to criticize Their Royal Highnesses.

## C. Career-related injuries, disruption of personal life

62. The Syndicate's maltreatment of me began at IUSM, where I was employed in various academic positions during the period June 1987 through June 1996, the last three years of that time as a tenure-track assistant professor. I naively expected that, if I worked hard and met

the job requirements specified in my written contract, I would proceed along the road to tenure. I was wrong.

63. Gerald Bepko, supported by Evan Bayh, David F. Hamilton, Marion Circuit and Superior Courts, Mark Massa, and Marion County Prosecutor's Office, embraced the politics of sexual harassment, also known as promoting prostitution under Indiana law. I expressed opposition and did not participate. To punish me for refusing to participate in their prostitution ring, as well as to discredit my complaints, they set out to destroy my reputation: They removed all accurate positive documents from my IU personnel files and replaced them with documents containing false, extremely libelous allegations about me. They sabotaged my research by spreading slanderous and libelous gossip that I fabricated and falsified data, and by ruining my experiments.

64. As part of the malicious effort to destroy my reputation, in 1994 Evan Bayh recommended the unqualified David F. Hamilton, who had served as his counsel, for a federal judgeship, in order to "get" me because I am an "uppity" woman and an "uppity" Jew. In 1994, I had had no interactions with federal courts and I was unaware even of the existence of David F. Hamilton.

65. Through their actions, the perpetrators maliciously destroyed my biomedical research career. Not satisfied with that, they went on to effect my dismissal from employment at IUSM and my blacklisting from all paid employment and law school.

66. Defendants have gone on to interfere with every aspect of my life. In order to accomplish this, they have employed their criminal gang practice of concocting false allegations that I am mentally ill and that I have perpetrated all sorts of misconduct to accomplish their objectives. They recruit amoral women to commit identity theft against me, engaging in criminal and other misconduct in my name, so that I will receive the blame and punishment for their misbehavior,

16

and they may receive undeserved benefits. They recruit other miscreants to falsely identify the identity thieves as Carolyn Srivastava.

67. Following in the footsteps of IUPUI, some of Indianapolis-area Jewish leadership established a practice of promoting prostitution. I did not participate. In collaboration with David F. Hamilton, Evan Bayh, Mark Massa, Gerald Zore, Linda Major, IMPD North District officers, and other unscrupulous government officials, Zeff Weiss, David Vonnegut-Gabovitch, and Ellen Gabovitch sought to punish me for refusing to become a prostitute: from early 1999 up to the present, they employed taxpayer-funded government law enforcement, along with threats and intimidation, to exclude me from all Indianapolis-area Jewish congregations. The government officials' intent was to discriminate against me because I am Jewish and to force me to convert to Christianity, and to take advantage of me because I am a vulnerable single woman.

68. The so-called criminal justice system is so full of corruption and incompetence that it is a cruel joke that wantonly destroys lives. I call it a bullyocracy.

69. In order to discredit and isolate me, defendants have created email accounts in the name Carolyn Srivastava or something similar intended to indicate me, to send pornographic and/or threatening email messages purporting to have been sent by me. It is possible to send an email bearing the exact sender address of someone with a legitimate account that is not from the account holder: I personally have received email messages purportedly sent from my email address that were not sent by me. Defendants also corrupt my real emails by inserting pornographic and/or threatening statements into them. Every time I send or receive a personal email message, they follow right behind with one of their threatening, pornographic communications, so recipients will respond with hostility toward me.

70. Syndicate identity thieves also make threatening and pornographic telephone calls purporting to be from me. It is possible to pay a service to have any telephone number displayed

on the recipient's caller ID, regardless of the number from which the call is placed.

71. Defendants have used false accusations of drug dealing excuse to monitor all of my activities, including using my neighbors to record everyone who visits my home and report the information to private citizens, in order to interfere in and disrupt my life.

72. In order to invade my home, defendants recruit young men to impersonate my son, to allow them into my home in my son's name. My son does not own any part of my home or the property on which it sits, he does not reside in my home, and he has no authority whatsoever to invite anyone onto my property.

73. I would like to have a job with pay like everyone else, but defendants and their attorneys employ slander, libel, identity theft, and intimidation tactics to keep me as their uncompensated slave.

**D. Injuries to my home and property**

74. College Park Club, Inc. ("College Park Club") is an Indiana nonprofit corporation that serves as the homeowners' association for the residents of College Park, a residential subdivision of approximately 465 homes in Pike Township in Marion County, where I, plaintiff Carolyn H. Srivastava, reside and own a home. All record owners of fee interest in one or more lots or dwelling units in College Park, including me (plaintiff), are necessarily members of College Park Club and are assessed dues, which are used to maintain common areas.

75. College Park Club is managed by a board of directors and officers, who are supposed to be freely elected by the membership, pursuant to the provisions of the *Amended and Restated Articles of Incorporation of College Park Club, Inc.* ("Articles of Incorporation") and *Amended and Restated Code of By-laws of College Park Club, Inc.* ("By-laws"), which were recorded with the Marion County Recorder collectively as instrument number 1994-0106323.

76. The Articles of Incorporation and By-laws incorporate by reference the 2001 *Amend-*

*ed and Restated Plat Restrictions*, which amended the original Declaration of Restrictions and Covenants[2] and are recorded as instrument nos. 2001-00202931 (applies to section 5); 2001-00202932 (applies to section 4 in which the neighborhood clubhouse, pool, playground, and tennis courts are located); 2001-00202933 (applies to section 3); 2001-00202934 (applies to section 2 in which I reside); and 2001-00202935 (applies to section 1). All of the *Amended and Restated Plat Restrictions* contain identical provisions, the only difference being the section number.

77. Article V, Sections 5.1 and 5.3 of the College Park Club Articles of Incorporation provide in relevant part, with respect to membership and voting:

> "**Section 5.1. Members.** Every person or entity who is a record owner of a fee interest in one or more Lots or Dwelling Units, which is or are a part of The Properties, shall automatically upon becoming an Owner of a Lot or Dwelling Unit be and become a Member of the Corporation;...."

> "**Section 5.3. Classes of Members and Number of Votes.** The Corporation shall have one class of membership, of which all Members shall be a part. Each Member shall be entitled to one (1) vote for each Lot or each Dwelling Unit in an area designated "Cluster Housing" in which such Member holds the interest required for memberships by this Article V, Section 5.1 with respect to each matter submitted to a vote of Members upon which the Members are entitled to vote. When more than one (1) person constitutes the Owner of a particular Lot or Dwelling Unit, all such persons shall be Members of the Corporation, but all of such persons shall have only one (1) vote for such Lot or Dwelling Unit, which vote shall be exercised as they among themselves determine, but in no event shall more than one (1) vote be cast with respect to any such Lot or Dwelling Unit."

78. Article II, Section 2.2 of the College Park Club By-laws provides in relevant part:

> "**Section 2.2. Individual Application.** Each of the Owners within College Park Club shall automatically and mandatorily be Members in the Corporation and be entitled to all of the privileges and subject to all of the obligations thereof. All Owners, by their acceptance of their respective deeds to their Lots or Dwelling Units, covenant and agree to be bound by the conditions, restrictions, and obligations contained in the Declarations of Covenants & Restrictions of College Park, said Declaration being recorded in the Marion County Recorder's Office on May 15, 1968, as Instrument No. 68-22374, together with all amendments or supplements thereto, the Articles of Incorporation, the rules and regulations of the Corporation and of the provisions hereof. All of the Owners, tenants, their guests and invitees, or any other person who might now or hereafter use or occupy a lot or

---

[2] The document contains a provision specifically allowing amendment.

Dwelling Unit or any part of the Common Properties shall be subject to the rules, restrictions, terms, and conditions set forth in the Declaration, the Articles of Incorporation, these By-Laws, and the Indiana Nonprofit Corporation Act of 1991 ….."

The Indiana Code citation of the Indiana Nonprofit Corporation Act of 1991 is Article 23-17.

79. David Vonnegut-Gabovitch, Zeff Weiss, David F. Hamilton, and Lula Patton are not record owners of a fee interest in any property in the area governed by College Park Club, and thus may not lawfully direct or influence College Park Club actions and policies.

80. Under Indiana law, the Articles of Incorporation and By-Laws constitute a contract between College Park Club and its members and between and among members. Thus, even though College Park sections 6 and 7 and the cluster housing (condominiums) in the subdivision did not adopt the *Amended and Restated Plat Restrictions* for their areas, their homeowners are contractually obligated as directors to enforce them as they apply to sections 1 through 5.

81. Article V, Section 5.2 of the College Park Club Articles of Incorporation provides in relevant part:

> "**Section 5.2.   Rights, Preferences, Limitations and Restrictions of Classes.** All Members shall have the same rights, privileges, duties, liabilities, limitations and restrictions as the other Members."

82. Article X, Sections 10.5 and  10.6 of the College Park Club Articles of Incorporation provide:

> **Section 10.5. Amendment of Articles of Incorporation.** Amendment to the Articles of Incorporation shall require the consent at least a Majority the Members as defined in section 5.4(d) hereof."

> "**Section 10.6.   No Private Benefit.**  No money or property received or held by the Corporation shall ever inure, directly or indirectly, to the private benefit of any Member, Director or Officer of the Corporation or to any other person whomsoever except for reasonable compensation for services actually rendered to the Corporation."

83. Article IX, Section 9.2 of the College Park Club By-laws provides in relevant part:

> "**Section 9.2.   Personal Interests**.  No Member of the Corporation shall have or

receive any earnings from the Corporation…."

84. Article X, Sections 10.1 of the College Park Club By-laws provides:

"**Section 10.1. Amendment.** These By-Laws may be amended by a Majority of the Owners as defined in Section 3.5(e) hereof in a duly constituted meeting called for such purpose, except as prohibited by any provision of the Declaration, the Act, or these By-Laws, as the same may be amended from time to time."

85. Paragraph B of the *Amended and Restated Plat Restrictions* provides in relevant part:

 "No industry, business, manufacturing, mercantile, storing, trade, or any commercial activity, educational or otherwise, designed for profit, altruism or otherwise, shall be conducted, practiced or permitted in the Addition;"

86. Under Indiana law, directors may be held personally liable for injuries caused by their own reckless disregard for the rights of others and/or for intentional malfeasance.

87. For many years, College Park was a peaceful, successful neighborhood. It is demographically very diverse, but we have peacefully co-existed with each other.

88. The destructive Syndicate launched a campaign to change all that. The Syndicate has instigated embezzlement of funds from our homeowners' association treasury, harassed members of our board of directors, instigated the wanton destruction of the beautiful mature trees in the neighborhood, made threatening telephone calls to my neighbors in my name, instigated flare-ups of bigotry and hatred, instigated haphazard development in Pike Township to reduce our property values, disrupted the operation of the MSD of Pike Township to impede the education of our children, and has generally done everything in its power to trash my neighborhood.

89. In approximately 1980 land south of the College Park subdivision on West 86th Street in Indianapolis, parcel no. 6007521 (to the best of my knowledge), was sold to Jewish Federation to build 111 federally subsidized apartments, called Park Regency, for low-income elderly. An average maximum density of ten units per acre for the land was required, resulting in open land north and south of the apartments to balance out the higher-density apartments. The Jewish Fed-

21

eration had committed to expand Park Regency to phase II apartments, but did not do so.

90. In 1998, the property owned by the Jewish Federation was [illegally] divided into three parcels: numbers 6007521 (the new middle parcel containing the 111 apartments on 8.015 acres, street address 8851 Colby Blvd.), 6027007 (the new 2.679 acre southern parcel, street address 8841 Colby Blvd.), and 6027008 (the new northern parcel comprising undeveloped land between the apartments and the College Park subdivision, street address 8861 Colby Blvd.).

91. The individual who signed the warranty deed dividing the property as president of the Jewish Federation Housing Corporation at the time was defendant Ellen Gabovitch, who has been a member of the same synagogue as David Vonnegut-Gabovitch, Angela Mansfield, and Zeff Weiss.

92. In 1999, the Jewish Federation sold most of parcel no. 6027007 for commercial development, which has resulted in increased traffic through College Park due to store patrons taking shortcuts. They litter our streets with trash thrown from their cars.

93. In 2006, the Jewish Federation sold parcel no. 6007521 with the Park Regency apartments to an out-of-state real estate investment company, obtaining a commitment to maintain the Park Regency apartments as housing for low-income elderly. The City of Indianapolis even went so far as to issue tax-exempt Economic Development Revenue Bonds approved by the Indiana Finance Authority for the purchase, in order to remove the property from ownership of a Jewish religious organization. The subsidized apartments for low-income elderly remain in operation and in violation of the housing density commitments.

94. With the strong support of Gregory Ballard's Division of Planning and Zoning, in July 2012 a Christian church group filed a petition with the Indianapolis Department of Metropolitan Development to rezone parcel no. 6027008 from residential to effectively commercial SU-1 to erect two church buildings and an accessory building for at least six congregations, case num-

ber 2012-ZON-048. The church groups planned at least three services with 100-200 cars each on Sunday and additional services with the same number of cars on at least three weeknights. They proposed parking lots for 200 cars bordering College Park, as well as a large commercial lighted sign facing College Park. The proposed use as it would have impacted the surrounding neighborhood is similar to a commercial movie theater.

95. The project was inappropriate for the property and would have destroyed our neighborhood. More than half of the College Park homeowners, as well as the Pike Township Residents' Association, expressed opposition to the church project. There is other, more suitable land available in the area (Pike Township, Council District 1), for which such a petition would be approved without opposition. The church groups did not own parcel no. 6027008, but submitted an offer to purchase the property contingent on approval of their petition.

96. A College Park homeowner who is a professional property appraiser predicted, from an analogous situation in another neighborhood, that the church project would have decreased our property values by at least 10%. Of course, this might decrease our property taxes if our properties were reassessed, but that would not compensate.

97. I recently received a notice from the Marion County assessor increasing the assessed value of my home by $13,000.00. Assuming the assessed value bears some relationship to the obtainable selling price, I am actually pleased. The increased property taxes I will pay over a period of several years will not total anywhere near $13,000.00.

98. Even though the church project was clearly inappropriate for the land in question, and even though 150 College Park residents attended the hearing as remonstrators, defendant Rex Joseph recommended approval of the project on September 27, 2012. The full Metropolitan Development Commission approved the project by a vote of 4-2 with three members absent on October 17, 2012 and certified it to the City-County Council, again with a large number of remon-

strators present. Since none of these government officials reside in the vicinity of the church pro-ject and it would not affect them personally, they made it abundantly clear that did not care if it destroyed my neighborhood. We taxpayers pay them to care about the preservation of Marion County neighborhoods, and not to mechanically rubberstamp destructive land use petitions using absurd rationalizations as justification. They should all be fired.

99. Jose Evans agreed to call the proposal out for hearing by the City-County Council if the organizers of the remonstrance would take a survey to indicate College Park homeowners' willingness to support College Park Club's purchase of the property, which would require an ex-tra dues assessment. As of November 12, 2012, 185 homeowners had responded, with 161 sup-porting the special assessment and 24 opposed. I expressed support. Jose Evans did call the peti-tion out for hearing at the November 12, 2012 meeting, and the City-County Council voted unan-imously to set it for hearing at its next regular meeting, on December 3, 2012.

100. At the December 3, 2012 hearing, the City-County Council voted 19-8, with two members absent, to deny the rezoning petition. Since at least 18 votes are needed to overturn a Metropolitan Development Commission approval of a rezoning petition, failure to vote due to absence has the same effect as a vote of "no." Those who effectively supported the destructive church project include Vernon Brown, Brian Mahern, Angela Mansfield, Frank Mascari, Steve Talley, William Oliver, Mary Moriarty Adams, Monroe Gray, Jr., and Vop Osili.

101. For the City-County Council overturn a rezoning petition after approval by the Met-ropolitan Development Commission is a rare occurrence. It did not happen by magic. We Col-lege Park homeowners, in collaboration with the Pike Township Residents' Association, had to spend a considerable amount of our own time and effort to defeat the rezoning in order to pre-serve our neighborhood. One of my major objectives in spending my own time, effort, and mon-ey to commence case no. 53C01-1211-PL-002395 (currently U.S. District Court for the Southern

District of Indiana case no. 1:12-cv-01848-LJM-DML) on November 28, 2012, naming the City-County Council among the defendants, was to have the rezoning denied. Out of concern that service of process would not be completed by December 3, I sent an electronic copy of my complaint to each City-County Council member via email on November 30, 2012. My complaint was critical in securing the requisite number of votes to deny the rezoning petition.

102. Now, Indianapolis/Marion County government, in collaboration with the vindictive Zeff Weiss and David Vonnegut-Gabovitch, is trying rush through an equally inappropriate and destructive high-density low-income apartment complex on parcel no. 6027008 that will increase traffic in an already high traffic area and bring in drug dealers and sexual predators.

103. The major Jewish Federation players in the rezoning effort: Ellen Gabovitch, David Vonnegut-Gabovitch, Angela Mansfield, and Zeff Weiss, do not live in the immediate vicinity of the properties in question and thus will not be personally impacted. As Jews, they have tried to use government to force us Jewish College Park homeowners to support a Christian church.

104. Ind. Code § 36-7-4-601 (c)(2) and (3) require the City-County Council, when enacting a zoning ordinance, to act for the purposes of "lessening or avoiding congestion in public ways" and "promoting the public health, safety, comfort, morals, convenience, and general welfare;" Ind. Code § 36-7-4-603 (4) directs the Metropolitan Development Commission and the City-County Council to "pay reasonable regard to" (i.e. not disparage concerns about) conservation of property values when considering rezoning proposals.

105. The immediate vicinity of the College Park subdivision contains an elementary school, a high school, many children residing in houses and apartments, and several retirement facilities for the vulnerable elderly, all of whom would be significantly harmed by the presence of drug dealers and sexual predators.

106. We College Park homeowners are now exploring the possibility of having College

Park Club purchase parcel no. 6027008, in order to ensure that it is used in a manner that benefits our neighborhood, by either keeping it as a recreation area or selling it to someone else who will improve the property in a manner that we find acceptable. I now oppose that option because 1) the process is very burdensome, as it may require amending our articles of incorporation, and will require many meetings, at least some of which will likely be contentious; 2) managing the property will be an extra burden; 3) we will have to pay an extra dues assessment, which will be a financial hardship for some homeowners, including me; and 4) it is the responsibility of city and county government, not us private citizens, to ensure beneficial use of land we do not own.

107. I have heard the suggestion that an Orthodox Jewish congregation could be built on parcel no. 6027008. As long as the congregation is strictly Orthodox, that would be a perfect use for the property, based on the following:

108. First, of all, we have, for many years, had "No soliciting" signs in our neighborhood because we do not want the privacy and sanctity of our homes invaded by uninvited strangers knocking on our doors to peddle goods and services, whether they be commercial, religious, po-litical, or anything else. No soliciting is equivalent to no trespassing. What most people know best about Jehovah's Witnesses, the group that sought to build the aforementioned churches, is that they go around to people's homes knocking on doors and aggressively trying to engage the occupants in conversations about religion against the occupants' will. I think if the churches had been allowed, the Jehovah's Witnesses would have compelled the removal of the "No soliciting" signs and policy with a resulting flood of solicitors of all types into the neighborhood. Jews, in stark contrast to Jehovah's Witnesses, do not proselytize. On the contrary, anyone wishing to convert to Judaism must initiate contact with a rabbi and will be actively discouraged at first. So an Orthodox Jewish congregation would not interfere with our No Soliciting policy.

109. Secondly, Orthodox Jews, as an integral part of their religious practice, do not drive

at all on the Sabbath and major holidays. So, traffic congestion in our neighborhood would not be a problem, and they would have no need for a large parking lot. Because Orthodox Jews use the building quite extensively, but generally in small groups of 10-20 people, so they would rarely, if ever, rent it out to another organization that would generate traffic. For large community gatherings, they would use either the Jewish Community Center or the Hasten Hebrew Academy, both located on a through road.

110. Thirdly, Orthodox Jewish congregations are relatively small and likely would not anticipate explosive growth, unlike the church groups, who specifically stated that they anticipated significant growth.

111. Fourthly, because Orthodox Jews do not drive on the Sabbath, they live within walking distance of the synagogue. This could have the effect of increasing our property values because it would create demand for our homes in excess of normal market forces. The property is an ideal location for an Orthodox Jewish congregation because of the variety of housing types within easy and relatively safe walking distance. And it would preserve our neighborhood tradition of encouraging walking, biking, and jogging.

112. Fifth, if the project fits into the residential milieu, rezoning would not be necessary, just a variance of some development standards to permit.

113. The government intent of railroading through the plainly destructive church project on parcel no. 6027008 was specifically to prevent a Jewish organization from purchasing the property and using it for a Jewish congregation. It has been Indianapolis/Marion County policy to segregate all Marion County Jewish congregations to a very limited area of Washington Township, as a Jewish ghetto. There is no more land available in the Indianapolis Jewish ghetto for new congregations, so one congregation that needed to build a larger building was forced to move to Carmel, in Hamilton County. IMPD has unlawfully interfered in that congregation's ac-

tivities. There is currently no Jewish congregation in Pike Township.

**E. Allegations relating to my family**

114. My parents had moved to Indianapolis in 1986 to be near my son, their only grand-child.

115. In December 1995 my parents, on their own initiative, established two similar trusts. The assets forming the trusts have been held and administered mainly from an account in Indiana. The trusts treated my sister, my only sibling, and me essentially equally as beneficiaries and successor trustees. My parents' intent was to designate beneficiaries while avoiding the expenses of probate upon their deaths. My mother and father personally gave me copies, and, given my mother's obsessive personality, I am 100% certain that she sent copies to my sister. It was my parents' general practice to treat my sister and me equally.

116. Elderly individuals with money attract vultures. Defendants who are not part of my family and who have no legal right whatsoever to any of my family's property decided to use their fabricated false defamatory gossip about me, exploiting my mother's and sister's gullibility as a mechanism for stealing my family's assets, particularly my inheritance. They took advantage of a huge loophole in Indiana trust law, which requires only that a trust be in writing and be signed by the settlor. Ind. Code § 30-4-2-1.5 (b). Additionally, in spring-summer 2003, they tried, with some success, to convince my parents that I am allegedly crazy by presenting them with a stack of documents containing bizarre ramblings to which my name and signature had been forged, but which were really drafted by David F. Hamilton, Sharon Murphy, Zeff Weiss, Gerald Bepko, and other Syndicate members.

117. From November 2005 - June 2006 contrary to my mother's decisively expressed wishes, Syndicate members induced my sister to claim power of attorney to imprison my mother in nursing homes in Indianapolis, and to have them treat my mother and me abusively. Subse-

quently, in June 2006, she forcibly moved my parents from their home in Indianapolis, where my father was living and my mother hoped to return, to a retirement facility in Tacoma, Washington called Franke Tobey Jones. My mother passed away from asphyxiation in their skilled nursing center in October 2007.

118. My sister moved my father from Tacoma to an assisted living facility in Nashville, Tennessee in January 2009, due to her job-related relocation. She purchased a home in Wilson County, Tennessee, where she has resided. She continued her practice of handling all of my father's financial affairs.

119. I (plaintiff) visited my father In Nashville in April 2009 and May 2009. My father, then 91 years old, seemed to be settling in, despite the stress of having been moved around the country like a piece of furniture.

120. In late October 2009 I sent my sister an email message expressing a desire to invite my father to my home for Thanksgiving. In order to prevent my interacting with my father, intruders Zeff Weiss, David F. Hamilton, and Michael Sontag induced my sister to institute a frivolous *ex parte* proceeding to make my sister my father's conservator (guardian), Davidson County, Tennessee case no. 09P-1680. It was granted without any meaningful adjudication of his capacity to make personal decisions. He was not even represented at the so-called hearing.

121. Michael Sontag, Zeff Weiss, David F. Hamilton, Sharon Murphy, and malevolent facility staff then used the conservatorship to engineer an "accidental" fall in the early morning hours of November 10, 2009. My father was sent to another facility's skilled nursing unit for rehabilitation after a short hospital stay for the fall. He was supposed to return to his home within a few weeks. Instead, he disappeared, and I was informed that he had passed away. I received a death certificate, but it contains materially inaccurate statements and the confirming physician's signature may be forged. My father remains alive, imprisoned in a locked Alzheimer's facility in